# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **ROLONDA F. MOORE,** | ) | |
| | ) | |
|    **Plaintiff,** | ) | |
| | ) | |
|       vs. | ) | **CAUSE NO. 1:14-cv-53-WTL-MJD** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
|    **Defendant.** | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Rolonda F. Moore requests judicial review of the final decision of the Defendant, Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), denying Moore's application for Supplemental Security Income ("SSI"). The Court, having reviewed the record and the briefs of the parties, rules as follows.

## I.    APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity she is

not disabled, despite her medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 416.920 (a)(4)(iv). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 416.920 (a)(4)(v).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Id.*, and this court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in her decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon*, 270 F.3d at 1176.

## II. BACKGROUND

Moore was born on August 24, 1964, and was 40 years old at the time of the alleged onset of disability. Moore has completed the twelfth grade and has prior relevant work experience as a customer service manager and secretary. She applied for SSI on April 25, 2011, alleging disability beginning December 24, 2004. In her application for benefits, Moore alleged she was disabled due to anxiety, fibromyalgia, rheumatoid arthritis, degenerative disk disease, gastroesophageal reflux disease, colitis, arthritis, high blood pressure, migraines, and difficulties with her left upper extremity. Her application was denied initially and upon reconsideration, after which she requested and was granted a hearing before an Administrative Law Judge ("ALJ"). On August 7, 2012, Moore appeared with counsel and testified at an administrative hearing before ALJ James R. Norris. ALJ Norris issued his decision denying Moore's application on August 22, 2012. On November 14, 2013, the Appeals Council denied review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner and subject to judicial review.

*Medical Evidence*

In February 2010, Moore presented to Dr. Marcia Johnson, a rheumatologist. During this initial appointment, Moore complained of difficulties with joint pain, swelling in her hands, ankles and lumbar spine, and tenderness and decreased motion in her shoulders. Dr. Johnson noted that Moore's elbows were within normal limits, her wrists were tender but had no evidence of swelling, and she was able to make seventy-five percent of a fist. Dr. Johnson also evaluated laboratory data. This data showed that Moore had a negative ANA factor and a negative rheumatoid factor. Overall, Dr. Johnson diagnosed Moore with inflammatory polyarthritis,

fibromyalgia, lumbar and sacral osteoarthritis, and hypertension. Dr. Johnson started Moore on several medications, including Prednisone, Methotrexate, and Folate.

On April 4, 2010, Moore returned to Dr. Johnson for a follow-up. During this appointment, Moore showed improvement with no tenderness of the cervical spine or shoulders. Her elbows, wrists, and knees were within normal limits. She continued to have slight swelling in the hands and could still only make seventy-five percent of a fist. On July 26, 2010, Moore returned to Dr. Johnson. During this visit, her joints were within normal limits and she could make one-hundred percent of a fist. Dr. Johnson urged compliance with the medication regimen. Moore also complained of new lower back pain.

On February 14, 2011, Moore presented to a neurologist, Dr. Jessi Li, complaining of decreased sensation in the upper extremities. An EMG was performed on her upper extremities, but it showed no evidence of neuropathy. Dr. Li advised Moore to follow up with Dr. Johnson.

In March 2011, Moore met with a new physician, Dr. Andrew Campbell, to establish primary care. During this appointment, Moore complained of anxiety. Dr. Campbell prescribed Klonopin and Cymbalta. By May of 2011, Moore was still reliant on Klonopin.

On March 15, 2011, Moore returned to Dr. Johnson complaining of new pain in her left elbow after she hit it. Dr. Johnson ordered imaging of her elbow. An x-ray was taken the same day, but showed no abnormalities.

On April 7, 2011, Moore presented to Dr. Brad Prather for a specific evaluation of her elbow. Moore had no swelling, but she did have tenderness and some limitations of motion. Dr. Prather advised occupational therapy. Moore attended occupational therapy for approximately a month, but noted no benefits. Dr. Prather gave her a lateral epicondylar injection and sent her back to occupational therapy.

On May 26, 2011, Moore returned again to Dr. Johnson. Upon examination, Moore had some mild tenderness over her cervical spine and left elbow, but otherwise she was within normal limits. Dr. Johnson reported that her rheumatoid arthritis was under excellent control with medication.

On July 27, 2011, Moore's rheumatoid arthritis was no longer stable due to her discontinuation of her medication after she lost her Medicaid. Dr. Johnson reported that Moore had a "flare up" related to her discontinuation of medication. She reported that Moore needed to continue the Methotrexate, and she provided Moore with samples of Humira.

By December of 2011, Moore's rheumatoid arthritis had improved, but Dr. Johnson noted suboptimal control with medication. She continued Moore on Methotrexate, but discontinued the Humira in favor of Enbrel. On March 28, 2012, Moore was still on these medications with better control over the symptoms, but Dr. Johnson was still worried about suboptimal control.

During this time, Moore also suffered from back pain. In July 2010, during a visit with Dr. Johnson, Moore complained of an increase in lower back pain with a new onset of bilateral numbness in her lower extremities. Dr. Johnson sent Moore for an MRI of her spine. The MRI was taken on July 29, 2010. This showed a small left-sided herniated disc at L4-5, however, Moore did not receive any new treatment for this impairment. Another MRI was taken on October 24, 2011, due to continued pain. This MRI showed a broad disc protrusion at the L4-5 level. These changes were worse than the prior MRI.

On November 9, 2011, Moore underwent a consultation with Dr. James Cole for evaluation of her back pain. The x-rays showed little evidence of degenerative disc disease. An

MRI, however, showed specific defects at L4-5. Dr. Cole thus ordered a discogram to confirm his findings.

On November 28, 2011, Moore underwent a lumbar provocative discography. This was positive at L4-5 levels, but negative at all other levels. A CT scan taken on the same day showed findings compatible with a central/left paracentral disc herniation/annual tear. Based on these findings, Dr. Cole recommended surgery. On December 27, 2011, Moore underwent an L4-5 discectomy with lumbar interbody fusion.

By January 2012, Moore was doing well. X-rays showed evidence of a solid fusion with intact hardware. Moore was neurologically intact with a normal gait. By April 2012, Moore was complaining of back pain, but the radiating symptoms were resolved. Physically, Moore walked normally. However, Moore continued to complain of back pain. Dr. Cole sent her for an epidural steroid injection, but did not advise further surgical intervention.

In May of 2012, Moore underwent an independent consultative examination as a part of the disability application process. During the examination, performed by Dr. Nauman Salim, Moore displayed a normal posture and gait and was able to squat and stand up. Dr. Salim did note that Moore had limited range of motion in her lumbar spine and in her bilateral elbows. Overall, Dr. Salim found that Moore suffered from rheumatoid arthritis, anxiety, fibromyalgia, and back pain status post fusion. Dr. Salim reported that Moore could not lift more than twenty pounds, stand more than two hours, or walk more than one hour. He also reported that she would have difficulties pushing and pulling, but that she should feel better with medication.

Subsequent to the examination in May of 2012, Dr. Salim completed a medical source statement concerning Moore's physical ability to do work-related activities. Dr. Salim opined that Moore could lift and carry up to fifty pounds occasionally and up to twenty pounds

6

frequently. He also opined that she could sit for five hours, stand for two hours, and walk for one hour total in an eight-hour workday. He stated that Moore could occasionally push or pull with her upper extremities but could frequently finger and feel and continuously reach and handle. He indicated that she should never crawl, she could occasionally climb ladders or scaffolds, she could stoop, kneel or crouch occasionally; and she could frequently climb stairs or ramps and balance.

*Hearing Testimony*

At the hearing, the ALJ began by hearing testimony from Dr. Paul Boyce, the medical expert. Dr. Boyce indicated that a diagnosis of fibromyalgia had been made based on fourteen tender points. He also indicated that a diagnosis of rheumatoid arthritis was made based on complaints of joint pain, but he noted that the diagnostic studies had been uniformly negative. R. at 62-63. Dr. Boyce further noted that Moore had a diagnosis of lumbar disk disease. *Id*. at 64. Dr. Boyce testified that Moore did not meet or equal any listing. *Id*. at 66. Dr. Boyce further testified as follows: Moore could lift or carry ten pounds occasionally and five frequently; she had no restriction for sitting; she could stand or walk for two hours a day; pushing and pulling could be done by her upper and lower extremities occasionally; ramps or stairs could be done occasionally; she could bend, stoop, crouch, crawl, or kneel occasionally; she had no restriction on reaching; grasping should be limited to ten pounds and it could be done frequently; fine fingering and handling could be done frequently, but she could not climb ropes, ladders, or scaffolds; she should not work with dangerous moving machinery, work on slippery or uneven

surfaces, or work from unprotected heights; and she should not drive if she is on narcotics. *Id*. at 67-68.[1]

For her part, Moore testified that she was unable to continue working because of her chronic pain. She testified that she has joint stiffness in the mornings that can last for two to three hours. She also stated that she has to take breaks every ten to fifteen minutes when she writes because of pain and stiffness in her hands and wrist. She testified that on a typical day, she will straighten up her house and do the dishes. She also testified that she naps "two or three times a day." *Id*. at 81. She testified that she can only sit for "about a half hour to 45 minutes at the most." *Id*. at 85.

After Moore finished her testimony, the vocational expert ("VE") testified. The ALJ asked the VE to consider a hypothetical individual with Moore's age, education, and work experience who could perform work with the following restrictions: lifting ten pounds occasionally and five pounds frequently; stand or walk up to two hours in an eight hour workday; sit up to six hours in an eight hour work day; push and pull with the upper and lower extremities with the same ten and five pound restrictions; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; grasping can be done but no greater than ten pounds as per the lifting restrictions; no restriction for fingering; and no work with dangerous moving machinery, slippery or uneven surfaces, unprotected heights, or driving. The VE testified that such an individual could perform Moore's past work as a billing clerk as the Dictionary of Occupational Titles ("DOT") defines it, but not

---

[1] The ALJ also heard testimony from Dr. Jack Thomas, another medical expert, concerning Moore's mental health. Dr. Thomas determined that any mental impairment Moore may have is non-severe and would not restrict her ability to work. Moore does not dispute this finding.

as she performed it. The ALJ then asked the VE to consider the same individual with the added requirement of taking two to three naps per day. The VE testified that the prior relevant work would not be available to this hypothetical individual.

### III. THE ALJ'S DECISION

The ALJ determined at step one that Moore had not engaged in substantial gainful activity since April 25, 2011, the application date. At steps two and three, the ALJ concluded that Moore had the severe impairments of "rheumatoid arthritis, fibromyalgia, and degenerative disk disease of the lumbar spine," R. at 12, but that her impairments, singly or in combination, did not meet or medically equal a listed impairment. At step four, the ALJ determined that Moore had the residual functional capacity ("RFC") to perform sedentary work with other certain limitations. Based on this finding, the ALJ determined that Moore has the capability to perform the requirements of her past relevant work as a customer service representative. Accordingly, the ALJ concluded that Moore was not disabled as defined by the Act.

### IV. DISCUSSION

Moore presents two issues for the Court's review. First, she argues that the ALJ erred in his treatment of the opinion of her treating physician. Second, she argues that the ALJ's RFC is erroneous because he "cherry picked" a one-time examination over the medical judgment of three physicians. The Court addresses her arguments below.

#### A. Moore's Treating Physician

Moore argues that the ALJ failed to assign proper weight to her treating physician's opinion. A recent Seventh Circuit opinion described what is commonly referred to as "the treating physician rule":

> A treating physician's opinion is entitled to controlling weight if it is supported by medical findings and consistent with substantial evidence in the record. If this

9

opinion is well supported and there is no contradictory evidence, there is no basis on which the administrative judge, who is not a physician, could refuse to accept it. But once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight and becomes just one more piece of evidence for the ALJ to consider.

*Bates v. Colvin*, 736 F.3d 1093, 1099-100 (7th Cir. 2013) (internal quotation marks and citations omitted). Moore argues that the ALJ erred in not assigning controlling weight to Dr. Marcia Johnson's opinion. Further, she notes that the ALJ failed to note what weight, if any, he did give to Dr. Johnson's opinion.

On May 11, 2011, Dr. Johnson, a rheumatologist with Hendricks Rheumatology, wrote a letter explaining that Moore has multiple medical problems, including rheumatoid arthritis and fibromyalgia. The letter also reported that, if the arthritis wasn't controlled, Moore might have permanent joint destruction and deformities. R. at 421. On March 30, 2012, Dr. Johnson wrote another letter noting that Moore is currently taking medications to help with the RA and that the "medications can help control disease state, however she will most likely continue to experience 'flare ups' from this disease." Dr. Johnson further stated that the "symptoms from RA have limited her ability to care for herself" and that Moore "should not engage in any activity that requires *repetitive* motions." *Id*. at 510 (emphasis added). However, Dr. Salim, a state agency doctor, completed a medical source statement concerning Moore's ability to do work-related activates on May 12, 2012, and concluded that she could engage in frequent fingering. *Id*. at 494.

In not assigning controlling weight to Dr. Johnson's opinion, the ALJ noted the following:

> Overall, the two letters written by Dr. Johnson shed very little light on the claimant's difficulties. They confirm that the claimant has problems, secondary to a diagnosis of rheumatoid arthritis. However, quite importantly, they also indicate that the claimant's condition is controllable with medication. Functionally, Dr. Johnson only advised no repetitive movements; she did not opine that the claimant was unable to work.

10

*Id*. at 25. The Court does not see any error in the ALJ concluding that Dr. Johnson's opinion was not entitled to *controlling* weight. As noted above, Dr. Salim concluded Moore was capable of frequent fingering; similarly, Dr. Boyce, the medical expert, found that Moore could engage in fine manipulation (fingering) on a frequent basis. Both of these opinions contradict Dr. Johnson's conclusion that Moore should not engage in *any* repetitive activities.

That said, the Court agrees with Moore that the ALJ erred in not articulating what weight he gave to Dr. Johnson's opinion, a specialist who had seen Moore on a regular basis February 2010. *See, e.g.*, *Scott v. Astrue*, 647 F.3d 724, 740 (7th Cir. 2011) ("And even if there had been sound reasons for refusing to give Dr. Tate's assessment controlling weight, the ALJ still would have been required to determine what value the assessment did merit."). The Seventh Circuit has held that, "'[i]f an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion.'" *Id.* (quoting *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ failed in this regard. In his decision, the ALJ failed to address almost all of these factors; the only factor mentioned by the ALJ is a passing reference to Dr. Johnson's specialty.

On remand, the ALJ should carefully consider the factors noted above and specifically note what weight he assigns to Dr. Johnson's opinion.

### B. Erroneous RFC

Moore next argues that the ALJ's RFC assessment was erroneous. The ALJ concluded that "[g]iven her most recent normal findings from an independent source, there is no indication that she requires specific fine and gross manipulative restrictions." R. at 27. Moore claims the

11

ALJ failed to weigh and consider all of the evidence in making this determination and "cherry picked" a one-time examination to overrule the opinions of three doctors. The Court agrees.

In his decision, the ALJ relied heavily on Dr. Salim's May 12, 2012, examination, which was the most recent and independent exam of record, in determining that Moore had no deficiencies with her hands. *Id*. at 27. However, Dr. Salim's report indicates that Moore was still limited to fingering only frequently. *Id*. at 494. In addition to Dr. Salim's report, both Dr. Boyce and Dr. Johnson recommended limitations on fingering frequency. Dr. Boyce restricted Moore to fingering frequently, *id*. at 69, and Dr. Johnson recommended that Moore not engage in repetitive motions at all. *Id*. at 510. Thus, the ALJ impermissibly "played doctor" by disregarding the opinions of all three physicians, including the state agency physician to whom the ALJ gave great weight.

On remand, the ALJ must refrain from "playing doctor" and should clearly articulate what evidence on the record supports the finding that Moore should have no restrictions in specific fine and gross manipulation.[2]

---

[2] Moore also argues that the ALJ's step four determination was improper. At step four, the ALJ found that Moore was capable of performing her past relevant work as a billing clerk. This listing is for a sedentary work position which requires constant fingering. DOT § 214.482-010. The ALJ made this finding based on his determination that Moore should not have any restrictions in fingering. Moore argues that she would have been disabled if the RFC did indeed preclude constant fingering because the ALJ failed to conduct a Step Five analysis. The Court does not agree with this argument. On remand, if the ALJ can adequately articulate why there should be no fingering restriction on Moore, then no Step Five analysis will be needed and Moore will not be under a disability. However, if the ALJ cannot articulate why there should be no restriction, this does not automatically mean Moore is precluded from all work. Should Moore's RFC contain a fingering restriction, the ALJ will proceed to Step Five to determine if Moore is capable of performing any other work.

## V. CONCLUSION

For the reasons set forth above, the Commissioner's decision is **REVERSED,** and this case is **REMANDED** for further proceedings consistent with this Entry.

SO ORDERED: 2/18/15

_William T Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification